IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CARMIE COLLEY,

    Plaintiff,

v.                                                 No. CIV. 99-994 JP/LFG

SANDIA NATIONAL LABORATORIES
LONG TERM DISABILITY PLAN,

    Defendant.

## MEMORANDUM OPINION

Plaintiff is an ex-electromechanical technician who has sued her former employer's long term disability plan. The parties have submitted this case for decision on the administrative record. Having considered the administrative record, the parties' arguments, and the applicable case law, I find, under the highly deferential standard of review that applies, that Defendant did not act arbitrarily and capriciously. Therefore, judgment should be entered in favor of Defendant.

The ultimate issue is whether UNUM Life Insurance Company ("UNUM"), the administrator of the Sandia National Laboratories ("Sandia") Long Term Disability Plan, arbitrarily and capriciously denied disability benefits to Plaintiff in violation of ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).[1] Sandvoal v. Aetna Life and Casualty Ins. Co., 967 F.2d 377, 381 (10th Cir. 1992) (observing also that the district court's responsibility is not to determine whether it believes Plaintiff is

---

[1] Plaintiff also sues under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3). Section 502(a)(3) is a catchall provision providing equitable relief where relief provided by another section of the statute would be inadequate. Varity Corp. v. Howe, 516 U.S. 480, 512 (1996). There is no indication that in this case an award of benefits due would be inadequate. Cf. id. at 515 (finding Plaintiffs had an individual remedy for breach of fiduciary duty under section 502(a)(3) because they could not proceed under sections 502(a)(1)(B) or 502(a)(2)).

entitled to benefits but to examine the administrator's actions).  However, Plaintiff makes the preliminary assertion that the administrative record[2] is missing the following materials:

! medical records from Dr. Albert Brown concerning Plaintiff's sleep apnea (Doc. No. 50 at 3.)[3]

! Exhibits 5 (a computer print-out entitled "Personnel Actions"), 6 ("Termination Information" from Plaintiff's supervisor), and 7 (a memo from the Sandia benefits coordinator) attached to Plaintiff's response to Defendant's motion for summary judgment  (Id. at 4-5, 10.)

! "additional" medical information about Plaintiff's sleep apnea that "somehow" never made it into the record (Id. at 8.)

! time records showing Plaintiff's last day of work (Id. at 10.)

! Sandia's Sickness Absence Management Program ("SAMP") records indicating "the medical context" in which Plaintiff worked  (Id.)

! Dr. Snider's chart notes (Id.)[4]

Plaintiff seems to make three arguments about these allegedly missing materials.  First, she claims that Sandia's failure to include them among documents Sandia furnished to UNUM amounts to

---

[2] The administrative record is attached as Exhibit A to Exhibits 1 ("S" series) and 2 ("UCOL" series) to Defendant's motion for summary judgment, Doc No. 30, and is cited in this Memorandum Opinion and Order without reference to the series of zeros preceding the first non-zero digit of each page number.

[3] Plaintiff does not mention Dr. Brown on page 3 of her brief.  Instead she refers to the affidavit which she submitted in response to Defendant's motion for summary judgment.  The only medical records, as opposed to employment or administrative records, described in that affidavit are those from Dr. Brown concerning sleep apnea.  (Doc. No. 37 Ex. 14 ¶ 6B.)  The affidavit does also make reference to records from Dr. f/n/u Snider, id. ¶ 6B.  But Plaintiff says in paragraph 6B that she wishes to offer those as evidence about when she returned to work, that is, as employment records.

[4] Plaintiff on page 10 of her brief repeats assertions about missing materials which she made earlier and which I have listed above.

a breach of fiduciary duty under ERISA section 502(a)(2).  (Doc No. 50 at 13-14.)  Plaintiff cannot now invoke section 502(a)(2) to argue that Sandia breached a fiduciary duty to her by failing to provide documents to UNUM.  Sandia is no longer a Defendant, Doc No. 19 at 11, and Plaintiff is suing under ERISA section 502(a)(1)(B) for benefits due and under 502(a)(3) for equitable relief, Doc No. 21 ¶5, not under section 502(a)(2).

Second, Plaintiff seems to imply that even if the record before UNUM supports upholding UNUM's decision, its alleged shortcomings are so great that the only just result is to award benefits to her.  She may also be contending that the record should be supplemented.  There are several general problems with either position.  One is that the Tenth Circuit has been quite emphatic in saying that when a district court examines a section 502(a)(1)(B) claim, it should examine only the evidence which the administrator had considered in making its decision.  Sandoval, 967 F.2d at 381 (observing that a district court's consideration of evidence developed after the administrator made a decision would be improper).  There may be instances in which procedures such as discovery might be warranted to address a claim that evidence has vanished from the administrative record for unexplained reasons.  Plaintiff had an opportunity to make a discovery claim which she failed to pursue.  Defendant objected to the Magistrate Judge's order permitting discovery (Doc. No. 25) and Plaintiff never responded.  Plaintiff also made various attempts at articulating a claim other than one for benefits due.  (E.g., Doc. No. 40.)  Moreover, Plaintiff has never cited any case or statutory authority to bolster her implied contention that the record must be supplemented.  It is uncertain whether Plaintiff even makes this argument.

Another problem with Plaintiff's implied position that the record is too incomplete to examine is that many of Plaintiff's claims of holes in the record are without merit.  For instance, the record does contain medical records from Dr. Brown concerning sleep apnea.  In fact, he diagnosed Plaintiff's sleep

3

apnea on the Attending Physician's Statement in which he also concluded that Plaintiff is capable of light work. UCOL 178-79. Similarly, the record also contains extensive "chart notes" some of which are clearly from Dr. Snider. E.g., UCOL 231.[5] The record even contains evidence suggesting that some individuals at Sandia believed that Plaintiff was disabled. E.g., UCOL 188.[6]

Still further, many of the classes of missing material are irrelevant to the ultimate issue in this case which concerns UNUM's conduct. Some of the alleged missing evidence relates to subjects that have nothing to do with whether UNUM arbitrarily and capriciously denied Plaintiff benefits. In this category are items such as Exhibit 6 to Plaintiff's Response to Defendant's motion for summary judgment, which indicates that Plaintiff was fired for poor attendance and time records showing Plaintiff's last day of work. Other of the alleged missing evidence, relating to how Sandia viewed Plaintiff's condition, is irrelevant too. Certain Sandia employees, such as the benefits coordinator, might have believed that Plaintiff was disabled. But the fact that Sandia may have terminated Plaintiff because she was too sick to work effectively does not mean that UNUM must have automatically commenced paying benefits to her. Even Exhibit 7 to her Response to Defendant's motion for summary judgment--which Plaintiff repeatedly insists UNUM should have considered-- acknowledges that UNUM (or its predecessor) and not Sandia was the entity with the authority to make the determination as to whether Plaintiff was disabled so as to qualify for long term disability benefits. To

---

[5] The record also contains many handwritten notes, a number of which appear to be signed by "Snider, MD." E.g., UCOL 233, 234, 237, 240, and 241. I cannot definitively discern the handwriting, however, and no party attempts to clarify.

[6] On the other hand, information which Plaintiff insists should have been part of the administrative record suggests that Sandia dismissed Plaintiff simply for missing too many days from work. (Doc. No. 37 Aff. A Ex. 6).

I also observe that Plaintiff has previously argued that she could have successfully fought her termination. (Doc. No. 37 Aff. A ¶7.) It is difficult to understand how she could have succeeded if, as she maintains, her SAMP allotment was exhausted and she was disabled from working.

use Plaintiff's terminology, it is not "absurd" for UNUM to have found that she did not qualify for long term disability even though someone at Sandia might have thought she was disabled or that the Social Security Administration found she was entitled to benefits. UNUM's standards are the only standards that matter now. Plaintiff's position is that she was under the impression that accepting Sandia's disability termination was all she needed to do to ensure that UNUM would look favorably on her application for long term disability benefits. That is simply not the way the Sandia plan works and the statute under which Plaintiff sues does not provide a cause of action for Plaintiff's misunderstanding, no matter what the cause.

It is a "basic rule of insurance law" that the burden was on Plaintiff to support her claim. McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1205 (10th Cir. 1992). She has had many opportunities, and indeed many express invitations, to do so. Plaintiff has not made a convincing argument that she should be permitted at this late date to present new evidence. Similarly, she has not shown that the record is so deficient that I must conclude that UNUM's decision was arbitrary and capricious.

Having disposed of the preliminary matters which Plaintiff raises, I turn now to the question for decision: Whether, in light of the administrative record now before the Court, UNUM arbitrarily and capriciously denied long term disability benefits to Plaintiff. The Tenth Circuit has noted that arbitrary and capricious decisions include those which lack substantial supporting evidence, as well as those in which the administrator acted in bad faith or under a conflict of interest. Sandoval, 967 F.2d at 380 n. 4. There is no evidence that UNUM acted in bad faith and I have already found that there was no conflict of interest. (Doc. No. 27 at 9 n. 7.) "Substantial evidence" is that which "a reasonable mind might accept as adequate to support [the decisionmaker's decision]. Substantial evidence requires more than a scintilla but less than a preponderance." Sandoval, 967 F.2d at 382 (quotation omitted).

When applying the arbitrary and capricious standard of review to an administrator's decision, the decision must be upheld unless it is not grounded in any reasonable basis. Kimber v. Thiokol Corp. 196 F.3d 1092, 1098 (10th Cir. 1999) (citation omitted). An administrator's decision need not be the only logical one or even the best one. Id. (same). As long as it falls "somewhere on a continuum of reasonableness--even if on the low end," the decision should stand. Id. (same). This is a "narrow" standard of review in which an administrative decision based on conflicting evidence can be upheld. Id. at 1099.

Against this backdrop, it is clear that UNUM did not act arbitrarily and capriciously in finding that Plaintiff was not disabled.

On October 4, 1995, Plaintiff, through Linda Stefoin in the Sandia Benefits Administration, sent a disability application "packet" to UNUM. UCOL 188. The cover letter indicates that Plaintiff's termination date was October 18, 1995. Id. Defendant represents, and Plaintiff does not dispute, that the packet included her signed application (UCOL 190-92), a Job Analysis outlining the physical requirements for Plaintiff's job, (UCOL 195), an Attending Physician's Statement completed by Dr. Brown who treated Plaintiff's asthma (UCOL 203-04), an Attending Physician's Physical Capacities Evaluation completed by Dr. Brian Altman who treated Plaintiff's ankle condition (UCOL 205-06), and Plaintiff's medical file from Sandia ("medical file") which included extensive notes from Drs. Brown and Altman, and others (UCOL 207-319).

Plaintiff applied for long term disability benefits based on her self-described severe asthma condition and left ankle injury. UCOL 190. Plaintiff did not list sleep apnea as a basis for disability. The medical file documented Plaintiff's bouts with asthma (e.g., UCOL 310) and sleep apnea (e.g., UCOL 312) as far back as 1993, as well as her ankle injury, (e.g., UCOL 227), which apparently dated to January 1994 (Doc. No. 21 at ¶2). The medical file also documented Plaintiff's condition during the

first half of 1995 when Drs. Brown, Chester Sakura, and others, several times certified Plaintiff as temporarily disabled, then cleared her to return to work. UCOL 211-14, 233.

On the Attending Physician's statement dated September 21, 1995, Dr. Brown observed that Plaintiff suffered from ankle pain, sleep apnea, and chronic asthma. UCOL 203. He also noted Plaintiff's peak flow rate. Id. He then concluded that these conditions did not preclude "light work" (a choice listed midway in a progression from "heavy work" to "sedentary work".) UCOL 204. The Attending Physician's Statement also asked Dr. Brown to include "medical evidence" and listed some examples, UCOL 203, none of which Dr. Brown submitted.

The first question on the Physical Capacities Evaluation asked Dr. Altman to indicate how long Plaintiff could remain in various positions at one time. UCOL 205. The form listed choices ranging from .25 hours to 4 hours. Id. Dr. Altman indicated that Plaintiff could stand for .5 hours, walk for .25 hours, and sit for 4 hours. Id. The next question asked, with choices ranging from .25 hours to 8 hours, the duration in which Plaintiff could do these things "IN A DAY." Id. Dr. Altman indicated that Plaintiff could stand for 3 hours, walk for 1 hour, and sit for 8 hours. Id. Dr. Altman also indicated that Plaintiff could frequently lift up to 20 lbs. Id.

The Job Analysis which UNUM possessed described Plaintiff's occupation as requiring her to walk for .5 hours in a day and sit for 7.5 hours, with occasional lifting of up to 10 lbs. Id.

The evidence in the medical file, and from Plaintiff's own doctors indicated that Plaintiff was capable of sitting for 7.5 hours and walking .5 hours in a day, with occasional lifting of up to 10 lbs. It was therefore not arbitrary or capricious for the UNUM reviewer to have tentatively concluded in a file memo, on October 17, 1995, that Plaintiff's claim should be denied. UCOL 320. But UNUM did not deny Plaintiff's claim on that date and instead on October 19, 1995 UNUM wrote to Drs. Brown and Altman asking for further information. UCOL 172-74.

7

UNUM asked Dr. Brown, among other questions, what accommodations Plaintiff might need to meet the job requirements described in the Job Analysis. UCOL-173. He indicated, with undated handwritten notations in the margins of UNUM's letter, next to the question about accommodations, "The [left] ankle neuralgia since her [left] ankle [treatment] 1/94 remains problematic and severe." UCOL-168. UNUM also asked Dr. Altman whether Plaintiff needed accommodations to fulfill the requirements in her Job Analysis and asked him to clarify whether Plaintiff needed any permanent restrictions. UCOL 172, 174. "To answer your questions specifically," Dr. Altman wrote, "[Plaintiff] should have her leg elevated probably as much as possible while seated. [Plaintiff] should ambulate minimal [sic] as possible" and that her condition would neither improve nor worsen. UCOL 169. "Permanent restrictions would be excessive weight bearing upon the foot through ambulation or through standing or climbing." Id. On November 8, 1995 UNUM further inquired by telephone with James Wilder, the individual who completed the Job Analysis for Sandia, whether accommodations for leg elevation would be possible. UCOL 165, 167. Apparently, some ankle elevation was possible. Id. Plaintiff does not dispute that accommodations were available or argue explicitly now that any offered accommodations were insufficient, although at one time Plaintiff asserted that she could only sit for ½ hour without needing to lie down with her ankle elevated. UCOL 131.

On November 8, 1995, by letter, UNUM denied Plaintiff's claim. UCOL 163-64. UNUM applied the following definition of disability:

> A sickness or nonoccupational injury which affects an employee's ability to work, and results in termination of employment after exhausting SAP [Sickness Absence or Accident Plan] benefits. The employee is prevented by such disability from engaging in any occupation or employment for which the individual is qualified based on training, education, or experience. The candidate/participant shall continue to be disabled if deemed by UNUM to be incapable of performing the duties of any occupation or employment for which the individual is qualified and capable of performing. At all times during the disability, the employee must be under the care of a legally qualified physician. Hospitalization or confined [sic] to a home is not necessary to be considered disabled.

UCOL 163; also Doc. No. 30 Ex. 2 ¶ 9 and Doc. No. 30 Ex. 3 ¶ 6.[7] UNUM had asked both of Plaintiff's primary doctors familiar with her condition in 1995 for their opinions about Plaintiff's physical capabilities and whether she was able to work. UCOL 203-06. The limitations on Plaintiff's physical activities that Dr. Altman described did not restrict her ability to perform the functions required by her job description. UCOL 205. Dr. Brown noted Plaintiff's sleep apnea and asthma (UCOL 203), but then clearly stated that Plaintiff was capable of working (UCOL 204). Nothing in the doctors' responses to the follow up inquiries--in which UNUM explicitly described Plaintiff's job parameters--signaled a retreat from their previous conclusions, and the doctors did not impose new limitations requiring impossible accommodations. UCOL 168-69. Although Dr. Brown suggested Plaintiff's asthma and ankle conditions were severe (UCOL-168), he did not alter his prior conclusion that Plaintiff could work (UCOL-204). Dr. Altman acknowledged that Plaintiff should elevate her leg (UCOL 169), but he too did not indicate that Plaintiff could not work. In view of these medical opinions, UNUM's November 8, 1995 decision was at the very highest end of the reasonableness continuum and cannot be disturbed.

      The November 8, 1995 denial letter advised Plaintiff that she could appeal and support an appeal with "objective medical evidence" such as "statements from your [p]hysicians." UCOL 164. On December 5, 1995 Dr. Altman wrote to UNUM indicating that Plaintiff "presents to me today stating that she has difficulty adhering to the capacities outlined by me on the [September 26, 1995] attending physician's physical capacity evaluation." UCOL 156. He wrote that

---

[7] Plan documents elsewhere define eligibility in terms that are different, but not materially so. E.g., S 20-21. The crux of any formulation is that Plaintiff must (1) have exhausted her SAP or SAMP benefits (2) been terminated, and (3) been found unable by UNUM to perform her job or any other for which she is qualified or suited. It is uncontested that Sandia terminated Plaintiff following exhaustion of her SAP or SAMP benefits.

Plaintiff "reports" that she is unable to sit for more than one half hour at a time.  Id.  Dr. Altman then indicated that he wished to amend his September 26, 1995 evaluation to reflect that Plaintiff could sit for "probably" only two hours at time with the leg elevated and one half-hour with the leg dependent.  Id.  Dr. Altman further felt that a question on the September 26, 1995 Physical Capabilities Evaluation, regarding Plaintiff's daily capacity for sitting, was unclear.  Id.  "[I]f this question is intended to mean how many hours in an eight hour day she is able to sit I would probably answer about four."  Id.

On December 19, 1995 UNUM found that Dr. Altman's December 5,1995 letter was insufficient to reverse UNUM's November 8, 1995 denial.  UCOL 121, 155.  Specifically, UNUM stated that Dr. Altman "failed to provide any objective medical documentation" to corroborate his view that Plaintiff could only sit for four hours in an eight hour day.  Id.  In a Memorandum Opinion and Order filed on Febraruy 20, 2001, I denied Defendant's motion for summary judgment on the ground that when I viewed the facts in a light most favorable to Plaintiff, it was inappropriate for UNUM to have discounted Dr. Altman's December 5, 1995 assessment that Plaintiff could not fulfill her job requirements.  (Doc. No. 44.)  I reached that conclusion primarily because UNUM said that Dr. Altman's December 5, 1995 letter was not "objective medical documentation" even though it was a "statement from [Plaintiff's] [p]hysician" and thus seemed to fit UNUM's exceptionally broad definition of "objective medical evidence."  UCOL 155.

I am still concerned about issues raised by Dr. Altman's December 5, 1995 letter and UNUM's treatment of it.  Dr. Altman indicated in his December 5, 1995 letter that he misunderstood a question on the September 26, 1995 Physical Capacities Evaluation (UCOL-156), which could render suspect UNUM's subsequent reliance on the Physical Capacities Evaluation.  The Physical Capacities

10

Evaluation asked Dr. Altman to assess how many "HOURS IN A DAY" Plaintiff could sit.  UCOL-205.  Under the incorrect impression that to everyone concerned the word "DAY" meant a 24-hour period, Dr. Altman chose the maximum:  8 hours.  But as Dr. Altman later learned, UNUM interpreted the Physical Capacities Evaluation to ask how many hours Plaintiff could sit and stand in a period of eight, not twenty-four, hours.  (Doc. No. 47 at 9 n. 5).  So in his December 5, 1995 letter Dr. Altman tried to explain that he had reported that Plaintiff could stand for three hours, walk for one hour, and drive for one half-hour in a 24-hour period

> which accounts for only 12-1/2 hours.  Assuming that she is not in bed for the remainder of the 12 [sic] hours she must be doing something and I thought it would be appropriate she be sitting.  I am not sure how to interpret this question in any other way, but if this question is intended to mean how many hours in an eight hour day she is able to sit I would probably answer about four.

UCOL-156.  Thus, at least at first blush, Dr. Altman was not suggesting that he wished to retreat from his earlier statements about Plaintiff's abilities because he now thought her less able.  Instead, Dr. Altman seemed to say that UNUM's imprecise questionnaire misled him and that consequently he needed to explain again what he had believed about Plaintiff's condition all along.[8]

However, Dr. Altman's December 5, 1995 letter went further.  Instead of merely trying to correct his prior Physical Capacities Evaluation, Dr. Altman seemed to shift his views on Plaintiff's capabilities, for instance, by revising his views on how long Plaintiff could sit at one time.  There was nothing ambiguous about that inquiry on the Physical Capacities Evaluation.  Indeed Dr. Altman did not claim this question--to which he answered four hours in September 1995 (UCOL 205), but "about

---

[8] While I feel that Dr. Altman's confusion about the length of a "DAY" was well-founded, I do not see that it matters whether he had a good reason to be mistaken.  The result of his mistake would be the same regardless of the cause:  it would alter the September 26, 1992 Physical Capacities Evaluation.  The conclusion might be different if Dr. Altman's confusion were feigned, but there is no evidence of that.

two" hours in December 1995 (UCOL 156)--ever confused him. The basis for this shift in opinion was unclear. When viewing the record in a light most favorable to Plaintiff, I observed that there was reason to believe that Dr. Altman had re-examined Plaintiff or performed a medical test since his September Physical Capacities Evaluation. (Doc. No. 44 at 6.) But as UNUM points out, under the much different standard which applies now, it was quite reasonable for UNUM to have viewed Dr. Altman's December 5, 1995 letter as nothing more than an attempt by Plaintiff to reduce her subjective complaints into a doctor's note. It was not contrary to law for UNUM to have interpreted the letter in this way and to have thus assigned it little weight--even if Dr. Altman's December 5, 1995 letter still fell within UNUM's expansive definition of what constitutes "objective" evidence. In other words, when UNUM was confronted for the first time with contradictory evidence it was not unreasonable for UNUM to have assigned weight to each set of evidence and then to have resolved the conflict against Plaintiff. UNUM was careless in characterizing Dr. Altman's December 5, 1995 letter in a manner that suggested it was not a "statement from [Plaintiff's] [p]hysician." UCOL 155. But its ultimate action in denying Plaintiff's first appeal was not unreasonable.

The terms Dr. Altman employed in his December 5, 1995 letter provide another reason why UNUM acted within the "reasonableness continuum" in rejecting Dr. Altman's new assessments. Dr. Altman would "probably" say that Plaintiff could only sit for "about" four hours of an eight hour day. UCOL 156. UNUM was not arbitrary in declining to place faith in this equivocal language.[9]

The intervening responses to the set of questions that UNUM sent to Dr. Altman on October

---

[9] Even if UNUM had construed--which it did not--Dr. Altman's December 5, 1995 assessment of Plaintiff's abilities as evidence that Plaintiff could not perform her job, it would also have been reasonable to read the letter ("Carmie Colley-Romero presents to me today . . .") as indicating that Plaintiff's condition worsened into a disability only after her termination. UNUM argues persuasively that the relevant date is October 18, 1995, when Plaintiff was terminated, and that a disability which manifested itself later is not relevant.

12

19, 1995 (UCOL-169) also support UNUM's decision to assign little weight to Dr. Altman's December 5, 1995 assessment of Plaintiff's capacity to sit.  In the October 19, 1995 letter, UNUM bluntly asked

> Do you feel Ms. Colley-Romero is in need of any [] medically-directed accommodations[, in addition to ankle elevation,] in order for her to successfully perform her occupation requiring 7.5 hours sitting. 0.5 hours walking, and occasional lifting up to 10 pounds?

UCOL 172, 174.  With this inquiry, UNUM cut to the heart of the benefits eligibility issue and made Dr. Altman aware of what Plaintiff needed to be able to do at work.  But in his response (UCOL 169), Dr. Altman failed to indicate that Plaintiff could not meet these demands, a fact unchanged by his later confession that he misunderstood the Physical Capacities Evaluation.

In sum, even if the administrator acted wrongly in failing to use the December 5, 1995 letter as a basis for fully disregarding the September 1995 Physical Capacities Evaluation, only the most shaky assessment based apparently only on a fully subjective patient report would remain.  It was within the spectrum of reasonableness for UNUM to have assigned this very little weight, particularly in light of (1) the October 19, 1995 inquiry as to whether Plaintiff could perform her job (2) Dr. Altman's failure to respond specifically, and (3) Dr. Brown's consistent opinion that Plaintiff could work.

The December 19, 1995 denial indicated that Plaintiff would be permitted to appeal, within 60 days, and again invited her to submit "objective medical evidence."  UCOL 121, 155.  On February 27, 1996 Plaintiff wrote to UNUM, arguing that Dr. Altman's undisputed training as an orthopedist is all the corroboration that should be necessary to support his December 5, 1995 letter.  UCOL 131. Plaintiff also said in her letter that on July 12, 1995 Dr. Snider had asked Plaintiff to request long term disability benefits from UNUM because her asthma "wouldn't stabilize as long as I was trying to work with my left ankle."  Id.  Plaintiff added that the peak flow data Dr. Brown reported was from a period in which she was resting, not working.  Id.  Finally, she enclosed what Defendant describes, without

13

objection from Plaintiff, as a portion of the medical file which UNUM already had.  (Doc. No. 47 at 8, citing UCOL 133 -152.)  On June 17, 1996 UNUM wrote back to Plaintiff indicating that her appeal was being forwarded to an "on site" physician.  UCOL 112.  The reviewing physician found that Plaintiff's peak flow rate was only slightly below normal and that he agreed that Plaintiff could perform light duty work.  UCOL 108.

On August 13, 1996 UNUM again denied Plaintiff's appeal.  UCOL 104-05.  In a letter dated that day, and in a follow up letter dated August 23, 1996 (UCOL 92-93), UNUM summarized some of the data in the record, including: the June 27, 1995 release to return to work with accommodations (UCOL 233), the September 1995 Physical Capacities Evaluation (UCOL 205-06), the additional comment in October 1995 from Dr. Altman (UCOL 169), his amended restrictions submitted on December 5, 1995 (UCOL 156), Dr. Brown's assessment that Plaintiff's asthma condition permitted light work (UCOL 204), and the specific requirements of her sedentary job (UCOL 195).  Thus, UNUM based its August 13, 1996 conclusion on essentially the same material as that upon which it based its December 19, 1995 denial, which I have already found was supported by more than a scintilla of evidence and was within the reasonableness continuum.  The only new material in Plaintiff's favor presented to UNUM after the December 19, 1995 decision was Plaintiff's letter of February 27, 1996 asserting that she believed she could not work.  It was certainly not arbitrary and capricious for UNUM to choose not to reverse its decision because of Plaintiff's own assertion of disability as of that date.

UNUM's August 23, 1996 letter again indicated that UNUM would consider "further objective evaluations or records of treatment."  UCOL 93.  On October 10, 1996 Dr. Altman wrote a letter to UNUM which reads in its entirety:

> I have been asked to dictate a letter concerning Carmie Colley-Romero's work restrictions.  Carmie has called me to ask me to redictate a letter about her work restrictions.  I have not see [sic] her since December 5, 1995.  Please find my work restrictions as noted at the end of the

14

first paragraph of the letter of December 5, 1995.

UCOL 79.  On October 24, 1996 UNUM responded to Plaintiff by indicating that Dr. Altman's October 10, 1996 narrative statement constituted no new information and thus Plaintiff's claim "remains closed."  UCOL 78.  I agree that Dr. Altman's October 24, 1996 letter amounted to nothing that merited reversal of UNUM's previous decisions.  UNUM's October 24, 1996 decision to leave the case closed was very reasonable.

On October 31, 1996 Dr. Altman again wrote to UNUM.  UCOL 49.  This time, he indicated that Plaintiff's "present" condition did not allow her to sit pain-free for more than one hour at a time with her leg elevated or one half-hour without elevating her leg.  Id.  He also said that she could not stand or walk for even one-half hour at a time without discomfort, and that pain medications stronger than Tylenol triggered asthma attacks.  Id.  In December 1996, Plaintiff informed UNUM that she had been awarded Social Security benefits (UCOL 77), although she never subsequently submitted any evidence used to support the Social Security claim.  On December 5, 1996 Plaintiff appealed the October 24, 1996 decision.  UCOL 70.

On January 2, 1997 UNUM wrote by fax to Dr. Altman for more information, such as the dates when he examined Plaintiff since December 5, 1995 and why his opinion changed between October 10 and October 31, 1996.  UCOL 66-68.  UNUM also tried unsuccessfully to speak with Dr. Altman by phone (UCOL 61-62) and to have Plaintiff have Dr. Altman call UNUM (UCOL 73).  Dr. Altman did not respond.  Nonetheless, UNUM forwarded Plaintiff's file to one (or perhaps two) consulting physicians, who indicated that the objective evidence, in contrast with Plaintiff's subjective reports from herself and through Dr. Altman, supported the conclusion that Plaintiff was capable of sedentary or light work.  UCOL 56.  On April 7, 1997 UNUM communicated these findings to Plaintiff, through her lawyer.  UCOL 36-37.  Again, UNUM was not arbitrary and capricious in

15

inquiring further into another apparent attempt by Plaintiff to present her own subjective beliefs as her doctor's clinical conclusions.  UNUM then acted reasonably in concluding that Dr. Altman's failure to explain his October 31, 1996 opinion rendered that opinion not substantial enough to reverse UNUM's consistent conclusion that Plaintiff was capable of working.  UNUM was also not acting contrary to law when it refused to commit itself to paying long term disability payments simply because Plaintiff let UNUM know that she had been awarded Social Security benefits.

Plaintiff did not appeal again.

In light of the conclusion that UNUM never acted arbitrarily or capriciously, judgment will be entered in favor of Defendant.

                                                  _____
                                                  **CHIEF UNITED STATES DISTRICT JUDGE**